AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**
U.S. District Court
District of Kansas

# UNITED STATES DISTRICT COURT

for the

### District of Kansas

MAY 1 8 2022

Clerk, U.S. District Court
By_____Deputy Clerk

In the Matter of the Search of:
*(Briefly describe the property to be searched or identify the person by name and address)*
The Premises and Devices Located at 722 E. 9th Avenue,
Hutchinson, KS 67501, as described fully in attachments "A",

)
)
)
)
)
)

Case No. 22-mj-6074-GEB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the **DISTRICT OF KANSAS**, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;

✓ contraband, fruits of crime, or other items illegally possessed;

✓ property designed for use, intended for use, or used in committing a crime;

a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C.  § 2252A(a)(1) | Transportation of Child Pornography |
| 18 U.S.C.  § 2252A(a)(2) | Distribution/Receipt of Child Pornography |
| 18 U.S.C.  § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

See Attached Affidavit

✓ Continued on the attached sheet.

Delayed notice of_____days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kasev R. Sundar, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 18 May 2022 @ 3:05 pm

_____
*Judge's signature*

City and state:  Wichita, Kansas

HONORABLE GWYNNE E. BIRZER, U.S. MAGISTRATE JUDGE
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

IN THE MATTER OF THE SEARCH OF:
THE PREMISES AND DEVICES
LOCATED AT 722 E 9TH AVENUE,
HUTCHINSON, KS 67501, as further
described in Attachment A

Case No. 22-mj-6074-GEB

## AFFIDAVIT IN SUPPORT OF APPLICATION

## FOR SEARCH WARRANT

I, Kasev R. Sundar, Special Agent of the Federal Bureau of Investigation, being duly
sworn, do hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.   I have been employed as a Special Agent ("SA") of the Federal Bureau of Investigation, since
January 8, 2021, and am currently assigned to the Kansas City Resident Agency, Wichita
(Kansas) Office. While employed by the FBI, I have investigated federal criminal violations
related to child exploitation and child pornography. I have gained experience through training
at the Heart of America Regional Computer Forensics Laboratory in Kansas City, MO and
everyday work relating to conducting these types of investigations. I have received training in
the area of child pornography and child exploitation, and have had the opportunity to observe
and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all
forms of media including computer media. At the Heart of America Regional Computer
Forensics Laboratory, I received training and certifications in using the Cellebrite software to
extract and analyze data from electronic media devices. I have also completed training,
provided by the FBI and the National Criminal Justice Training Center, on conducting Freenet

investigations. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2252 and 2252A, and I am authorized by law to request a search warrant.

2. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States, including violations of Title 18 U.S.C. §§ 2252 and 2252A. Before becoming a Special Agent for the FBI, I was an Army Officer on Active Duty. One of my additional duties during my Active Duty time was conducting non-judicial military investigations into actions that violated military policies such as negligent discharges of firearms, vehicle safety violations, and workplace accidents resulting in injuries.

3. I have received training on conducting a wide variety of criminal investigations, to include organized crime, drug trafficking, human trafficking, crimes against children, major theft, and other federal crimes. I have also received training on the preparation and execution of search warrants. I am currently conducting criminal investigations on multiple subjects.

4. As will be shown below, there is probable cause to believe that the identified residence will contain evidence of the distribution, receipt, and/or possession of obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 2252A(a)(1), 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2252A(a)(5)(B). I submit this application and affidavit in support of a search warrant authorizing the search of the residence described in Attachment A. I seek authorization to seize and examine evidence, fruits, and instrumentalities of the foregoing criminal violations, which relate to the aforementioned criminal violations, and as further described in Attachment B.

5. The information in this affidavit has been communicated to me by other law enforcement investigators and witnesses involved in this investigation, as outlined below. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included each and every fact known to me or other investigators concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support a search warrant.

6. This affidavit is only intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B:

- "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

- "Minor" means any person under the age of 18 years. See 18 U.S.C. § 2256(1).

- "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, see 18 U.S.C. § 2256(8) (A), or that have been created, adapted, or modified to appear to depict an identifiable minor, see 18 U.S.C. § 2256(8) (C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation;

(d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. See 18 U.S.C. § 2256(2) (A).

- "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

- "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

- "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.

## INVESTIGATION/PROBABLE CAUSE

8.    On June 14, 2021, FBI Special Agent Andrew Campbell received an email from the National Center for Missing and Exploited Children (NCMEC) in regards to Cyber Tipline Report 90263130, which was provided by Electronic Service Provider Snapchat, Inc. on May 16, 2021 at 5:13:02 UTC. Per NCMEC Cyber Tipline Report 90263130, Snapchat user "Scoobylivinlife" transmitted two images of depicting child pornography on May 15, 2021.

9.    The first image was shared on May 15, 2021 at 16:04:44 UTC. The image depicted a white female who was nude below her waist and lying down with her back on a mattress. The female was using her hands and arms to hold up and spread her legs to expose her vagina, buttocks and rectum. The female appeared to be a prepubescent minor due to her small body frame and no hair being present on her pubic region or her arms.

10.   The second image was shared on May 15, 2021 at 16:05:33 UTC. The image depicted a white female who was a completely nude. The female had her legs to completely expose her vagina

and partially expose her buttocks and rectum. The female appeared to be prepubescent minor due to a lack of developed breasts, small body frame, and no hair being present on her pubic region or her arms.

11.   The report from NCMEC for Snapchat user "Scoobylivinlife" stated the following:

- Account Creation: March 14, 2021 20:52:19 UTC

- Phone Number: 620-314-3772

- E-mail address: boomtownfarms2023@gmail.com

- Date of Birth: November 24, 1995

- IP Address: 172.58.189.186

12.   As part of a current and on-going child pornography investigation (discussed below), I was aware that the email address boomtownfarms2023@gmail.com, the phone number 620-314-3772, and the date of birth November 24, 1995 are all linked to Zachary Potter (POTTER), an individual currently living and working in Hutchinson, Kansas.

**FBI Phoenix Investigation**

13.   On January 6, 2020, an FBI Online Covert Employee (OCE) working out of the FBI Phoenix Division discovered an account on the social media platform LiveMe with the username "Boomtown1" and LiveMe profile identifier "3643760" posted approximately 10 image files to a LiveMe named "yunyum young girl."

14.   All 10 image files that LiveMe user "Boomtown1" posted depicted young Caucasian girls. One of the 10 image files depicted a young girl exposing her vagina because of her underwear being pulled down below her waist. The young girl's face and upper body are not visible, but the girl appears to be prepubescent due to a small body frame and having no pubic hair.

15. The other nine photographs depict young girls wearing either a bathing suit, tight shorts, dresses, or just underwear. Four of the images depict young girl's exposing their underwear. In one of the other images, a young girl in a bathing suit is standing on her right foot and holding onto a black strap that is lifting her left foot above her waist. In another image, a young girl in a white dress is standing on her toes with feet tied with rope, her arms raised and hands behind her head, and has a rope tied around her neck that appear to be suspended from ceiling. While the young girl's genitalia is not exposed, it does not appear that the young girl is wearing underwear.

16. The FBI Phoenix Division sent a subpoena to LiveMe requesting subscriber data for the account "Boomtown1". The response from LiveMe identified the following subscriber data:

- Name: boomtown1
- ID: 3643760
- Created on: 4/27/2019 00:09:24 UTC
- Phone: 620-513-6518
- Device model: Moto Z (2)[1]

**FBI Salt Lake Investigation**

17. On February 13, 2020, an FBI OCE working out of the FBI Salt Lake City Division discovered an account on the social media platform LiveMe with the username "Boomtown1" during the course of an online undercover session. During that online undercover session, the OCE identified that LIVEME user "Boomtown1" was a member of a known child pornography group titled "Everything Allowed". Members within this group

---

[1] A "Moto Z" is a model of Motorola smartphone.

shared hundreds of videos and images of nude, prepubescent age children, including infants and toddlers, engaged in sexual acts with adults and other children. LIVEME user "Boomtown1" posted images to the group depicting prepubescent age children posing in sexually suggestive positions, and one of the images depicted a prepubescent age girl performing fellatio on an adult male.

18. The FBI Salt Lake City Division sent a subpoena to LiveMe requesting subscriber data for the account "Boomtown1". The response from LiveMe identified the following subscriber data:

- Username: Boomtown1
- SID: 3643760
- Registration Device: Moto Z
- Email: boomtownfarms2023@gmail.com
- IP Address: 104.9.30.186 (AT&T)

19. The FBI Salt Lake City Division sent a subpoena to AT&T requesting subscriber information for the IP address logging into this LiveMe account. AT&T provided the following subscriber information:

- Name: Zachary D Potter
- Address: 709 E. Avenue B, Hutchinson, KS 67501
- Phone Number: 620-314-3772
- Email: boomtownfarms2023@gmail.com

20. On March 23, 2020, investigators in FBI Salt Lake City Division received a response to an administrative subpoena submitted to Google, LLC. for information related to boomtownfarms2023@gmail.com. A review of the information revealed the following:

- Google Account ID: 701406530379

- Name: Zachary Potter

- e-Mail: boomtownfarms2023@gmail.com

- Created on: 2017-09-06 21:01:56 UTC

- Terms of Service IP: 107.77.208.129

- Services: Web & App Activity, Gmail, Location History, Android, Google Calendar, Google Payments, Google Hangouts, YouTube, Google Play Music, Google Keep

- Last Logins: 2020-03-11 18:09:11 UTC, 2020-03-09 06:53:41 UTC, 2020-03-08 19:57:52 UTC

21. Database searches, via Accurint, Facebook, Utah Criminal Justice System, and the National Law Enforcement Telecommunications System, conducted by investigators of the FBI Salt Lake City Division on POTTER revealed the following:

- Name: Zachary Dean Potter

- Race: White

- Sex: Male

- DOB: 11/24/1995

- SSN: 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

- FBI#: MC334PPAM

- Address: 709 E. Avenue B, Hutchinson, KS 67501

- Phone: 620-314-3772

- Email: boomtownfarms2023@gmail.com

- Criminal History: Misdemeanor

**FBI Minneapolis Investigation**

22. On or about April 22, 2020, an OCE of the FBI Minneapolis Division conducted an Online Identity Takeover of a subject involved in trading child pornography on LiveMe. The Minneapolis OCE was a member of several LiveMe groups where child pornography was traded either directly in the chat, or by posting links to cloud file hosting services such as Dropbox or mega.nz.

23. On or about June 23, 2020, the OCE for the FBI Minneapolis Division observed LiveMe user Boomtown1 post a link to a mega.nz folder titled, "all." on the LiveMe group "🐾Wonderland🐾". The folder was created on August 24, 2019 and contained 26.64 GB of data in 2,370 files. The files primarily consisted of child pornography including videos depicting the rape of prepubescent children, infants, and toddlers. Some of the files depicted the sexual abuse of children in restraints.

24. The OCE also chatted with Boomtown1 via LiveMe between June 28, 2020 and June 30, 2020. The following is a rough transcript of the conversation.

> **[June 28, 2020]**
>
> Boomtown1: Sup
>
> Boomtown1: Got any pics
>
> OCE: Been getting a lot of dead links lately. You?
>
> Boomtown1: Same sucks need more links but got pics though hbu
>
> OCE: Waiting on a few replies. Hope to have some good stuff soon.
>
> OCE: age you into?
>
> Boomtown1: Right same there and 8 and up
>
> Boomtown1: Hbu

OCE: About the same. Teenagers can be bratty tho. My gf has a 3 and a 7. Very sweet age.

Boomtown1: Yeah I got a 5 6 and 8 year old nieces no kids for me. And oh right on

Boomtown1: [Shared an image of black panties]

Boomtown1: I just stole this from my friends daughter that's 13

OCE: 13 yo wearing that?

Boomtown1: U got pics

OCE: Haven't taken pics of the girls yet.

OCE: [shared an image of girls size 8 underwear]

OCE: Don't have to sneak these tho!

Boomtown1: Oh u don't your gf let me get them

OCE: wat?

Boomtown1: Lucky that u don't have to sneak them

OCE: yeah, sux when I have to do laundry lol

OCE: you do anything fun with the nieces?

Boomtown1: Hbu do anything fun with yours

OCE: we stay active. hot summer days mean getting ready for the pool and baths afterward...

OCE: something we're about to do in a couple minutes. I'll catch you later

Boomtown1: Right I feel yea we're all about to head to the lake we'll have fun should send pics later

**[June 29, 2020]**

Boomtown1: Hey what's up man

**[June 30, 2020]**

Boomtown1: Sup

Boomtown1: Hey man

Boomtown1: [Shared two images of a minor female approximately 8-10 years of age apparently sleeping. The child is seen wearing a Minnie Mouse t-shirt and girls underwear. A hand is seen apparently touching the child's hip/outer thigh. The second image depicts what appears to be a minor female wearing the same underwear. A hand is seen pulling down the child's pants to reveal the underwear and the child's posterior.] [The OCE noted in his/her report that the images are visually similar to images that a user had shared in a group communication on the social media platform Telegram.]

Boomtown1: See got my niece while she sleep

OCE: lol you in that Telegram too? Just seen that posted by a friend.

OCE: Or did you share them with someone else who is spreading them around?

Boomtown1: I shared them with somebody else

Boomtown1: Got any pics of your girls

### Hutchinson Surveillance and Additional Investigation into Potter

25. On December 3, 2021, I, along with Detective Lindsay Tabor and Detective Justin Reed of the Hutchinson Police Department, conducted physical surveillance on different addresses associated with POTTER. The result of the physical surveillance revealed that POTTER was currently residing at 722 E 9th Avenue, Hutchinson, KS 67501.

26. On March 24, 2022, I served a search warrant, issued in the United States District Court for the District of Kansas on March 21, 2022, via Google's online law enforcement portal for the digital contents of the Google account "boomtownfarms2023@gmail.com". Google provided

subscriber information for "boomtownfarms2023@gmail.com" that showed the subscriber's name is Zachary Potter with a date of birth November 24, 1995, and recovery phone number 620-259-3748. The Google Pay subscriber information for the account also showed the subscriber's name as being Zachary Potter who resides in Hutchinson, KS. The account "boomtownfarms2023@gmail.com" was created on September 6, 2017, and the account was last updated on March 22, 2022. On that day, the activity log provided by Google shows that the user accessed the account while using an Android operating system (commonly associated with mobile devices).

27.   On April 26, 2022, Detective Justin Reed of the Hutchinson Police Department contacted me via email to inform me that on the night of April 25, 2022, he had ordered a pizza for delivery to his home from Pizza Hut located at 123 W 4th Avenue, Hutchinson, KS 67501. The individual who delivered the pizza to his home was POTTER. During the delivery, Detective Reed noticed that POTTER was driving a red Dodge Charger SXT with Kansas tag number 95BOOM. A subsequent motor vehicle registration check revealed that the vehicle is registered to POTTER at 722 E 9th Avenue, Hutchinson, KS 67501.

28.   After receiving Detective Reed's email, I conducted database searches through the Kansas Criminal Justice Information System and discovered that POTTER had purchased the vehicle on February 4, 2022 and applied for registration on the vehicle on March 1, 2022. Additionally, POTTER obtained a Kansas driver's license on March 11, 2022, and the address on the driver's license is 722 E 9th Avenue, Hutchinson, KS 67501.

29.   Detective Reed sent me another email on April 26, 2022 to inform me that he checked with the City of Hutchinson's Utility Department and learned that utilities at 722 E 9th Avenue,

Hutchinson, KS 67501 are in POTTER's name and have been in his name since December 15, 2021.

30.  Based on the foregoing, there is probable cause to believe Zachary POTTER has used an internet-connected device, or devices, to access, possess, transport, receive, and distribute images of child pornography, and is likely in possession in such device or devices. It is reasonable to conclude that devices used by POTTER relative to his child pornography activities may be kept in his residence. Given POTTER's lengthy operation of the Gmail account and various social media accounts, it is likely that devices associated with POTTER, in his residence, will contain evidence relating to the foregoing violations of 18 U.S.C. § 2252A(a)(1), 18 U.S.C. § 2252A(a)(2), and 18 U.S.C. § 2252A(a)(5)(b).

## **CHARACTERISTICS OF CHILD PORNOGRAPHERS**

31.  From my own experience as an FBI Special Agent and from conversations with experienced investigators, including those at the Kansas Internet Crimes Against Children task force, I have learned the following regarding child pornography offenders:

  a.  The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature. In this investigation, POTTER was observed by an FBI OCE out of Salt Lake City, UT as being a member of a known child pornography group on LIVEME titled "Everything Allowed". POTTER posted images to the group depicting prepubescent age children, posing in sexually suggestive positions, and one image shows a prepubescent female performing fellatio on an adult male.

  b.  The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children. In this investigation, POTTER has shown that he has retained images of child pornography and child erotica by sharing them with various social media users, asking other social media users for photographs depicting child pornography

and child erotica, and being a member of groups on various social media platforms where members shared files depicting child pornography and child erotica.

c. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based mediums used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles. Frequently, multiple mediums will be used. In this investigation, POTTER communicated with an FBI OCE, working out of Minneapolis, MN, believing the OCE was a like-minded individual. POTTER asked the OCE to provide him photographs depicting child pornography and shared photographs depicting child pornography. Likewise, POTTER has demonstrated his desire to maintain access to child pornography by asking users on various social media accounts for child pornography as well as sharing photographs, videos, and mega.nz links that depict child pornography and child erotica.

d. The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper. In the present case, POTTER has apparently gained access to different groups involved in the trafficking of child pornography. It is likely that he has maintained notes or other records of these contacts on his devices inside his residence.

32. Affiant asserts that, because of the many characteristics which POTTER manifests (discussed above), his residence, the SUBJECT PREMISES, likely contains evidence of his persistent interest in child exploitation and child pornography, as well as evidence of contacts with other like-minded offenders.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

33. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive

or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

   a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file— for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives--contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct

under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g. , registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the

presence of additional electronic storage media (e.g. , a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g. , Internet searches indicating criminal planning), or consciousness of guilt (e.g. , running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic

programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

36.   Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.   Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all of the technical manuals

and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.  Searching computer systems requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can

conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

37.   Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crimeincluding, for example, serving as the instrument through which the perpetrator of the Internetbased crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

38.   Based on the foregoing, and consistent with Rule 4l(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later

review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### BIOMETRIC ACCESS TO DEVICES

39. This warrant permits law enforcement to compel POTTER, if found present at the SUBJECT PREMISES, to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

   b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's

contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.   As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.   Due to the foregoing, and because it is probable that POTTER is the individual engaged in the aforementioned criminal activity, if law enforcement personnel encounter any

device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of POTTER, if found present at the SUBJECT PREMISES, to the fingerprint scanner of the device(s) found at the SUBJECT PREMISES; (2) hold the device(s) found at the SUBJECT PREMISES in front of the face of POTTER, if found present at the SUBJECT PREMISES, to activate the facial recognition feature; and/or (3) hold the device(s) found at the SUBJECT PREMISES in front of the of POTTER, if found present at the SUBJECT PREMISES, to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel the individuals found at the SUBJECT PREMISES, including POTTER, to state or otherwise provide the password or any other means that may be used to unlock or access the device(s). Moreover, the proposed warrant does not authorize law enforcement to compel the individuals present at the SUBJECT PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s), without first obtaining a waiver of that individual's Miranda rights.

## CONCLUSION

40. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search

warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

41.  Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the SUBJECT PREMISES will contain evidence of violations of 18 U.S.C. § 2252.

42.  Further, I submit that such evidence, listed in Attachment B to this affidavit, constitutes contraband, the fruits of crime, things otherwise criminally possessed, or property, which is or has been used as the means of committing the foregoing offenses.

43.  I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

44.  Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the residence identified in Attachment A for the items listed in Attachment B.

Kasev R. Sundar
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me in my presence on this _18th_ day of May 2022.

THE HONORABLE GWYNNE E. BIRZER
United States Magistrate Judge

**ATTACHMENT A**

*Property to be searched*

The property to be searched is 722 E 9th Avenue, Hutchinson, KS 67501, further
described as follows:

The residence is third home east of the intersection N Pershing Street and E 9th Avenue. The
residence is a one-story home with two bedrooms, one bathroom, and is 672 square feet in area.
The exterior of the home is composed of wood that is painted white and a shingle roof that is
gray in color. No garage exists on the property. Land composed of grass, dirt, and concrete, on
the east side of the home appears to be used as a driveway by the residents of the home. There
appears are two windows on the front of the home. Photographs of the residence are attached.







**ATTACHMENT B**

*Property to be seized*

1.      Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica, in any format or media, including computer files, prints, negatives, drawings, and paintings.

2.      Any and all computer devices (including desktops, laptops, tablets, smartphones, as well as the hardware, peripherals, software, computer related documentation, passwords and data security devices, and storage devices), including the software or programs or applications contained therein, that may be or are used to:

    a.   distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

    b.   seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children;

    c.   communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and any and all data or information on the device which may relate to subparagraphs 2a, 2b, and 2c, including data or information that may reveal indicia of ownership, access, or use.

3.      Any and all notes, documents, records, correspondence, in any format and media (including, but not limited to, envelopes, letters, papers, diaries, manifestos, manuals, email messages, chat logs and electronic messages, and handwritten notes) pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

4.      Any and all cameras, film, videotapes or other photographic equipment, which may be used to contain, create or duplicate child pornography, visual depictions of minors engaged in sexually explicit conduct, or child erotica.

5.      Any and all documents, records, or correspondence, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the RESIDENCE described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

6.      Any and all records, documents, invoices and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

7.      Any and all records, documents, invoices and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer

storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

8.      Any and all records, documents, invoices and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern encryption, deletion, or destruction of evidence.

9.      Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.